We'll hear argument next in No. 2011, 1013, and 1026, Preston v. Marathon Oil. The issues here today are three-fold in the sense that we have two issues on appeal, and there's one issue on cross-appeal. The two issues that we bring forward on appeal are issues of ownership of the 764 patent, and that falls under Wyoming state law, dealing with the interpretation of contracts. The second issue is the issue of an equitable doctrine called shop rights, and whether Marathon or Pinnacle Energy has the right to use the invention claimed in the 764 patent, which is owned and invented by Mr. Preston. The issue on the cross-appeal, of course, is the inventorship of the 385 patent, which was subsequently filed by Marathon Oil Company, naming Tom Smith and Yale Preston as co-inventors. MS. HAYES Well, we only get to the shop right issue if we agree with you that the district court erred with respect to the contract issue. Is that right? MR. HAYES That is very, very correct. The issue on the contract issue is actually two issues. There are sub-issues in there. The first issue is whether or not the contract that Marathon claims requires Preston to assign his invention, his intellectual property, is even valid in the first place. That is, was there sufficient consideration? The issue there in Wyoming law we submit to this court is that in order for there to be sufficient consideration, it requires more than continued employment. What had happened in this case is Yale Preston went to work for Pinnacle Energy in February of 2001. They gave him an offer letter. He accepted and signed that offer letter and went to work under that offer letter for Pinnacle Energy, which at the time was a wholly owned subsidiary of Marathon Oil Company. Later after he began work, over a month later, Marathon presented to him or Pinnacle presented to him what they call the employment agreement, which he signed on April 5th of 2001, subsequent to his employment and subsequent to his contract. MR. HAYES The district court found that he began work on March 30th, I guess.  HAYES That is correct. MR. HAYES I understand you are not happy with that finding, but that was the district court's finding, right? MR. HAYES That was the district court's finding. It was March 30th. MR. HAYES The IRS form, W-4 I guess it is, was signed at the same time as the IP assignment agreement. The suggestion was, and I think the district court said something to this effect, that that appeared to be part of the initiation of employment set of agreements, correct? MR. HAYES The W-4, which the testimony was it was the second W-4, but that they were both signed on April 5th of 2001. The March 30th start date that the court found baffles us, because nowhere in the evidence or in the documents that support it is there anything to support a March 30th start date. The documents that are there in place are the February 27th, 2001 offer that was accepted from Pinnacle Energy. There is the benefit information sheet.  HAYES And the specific and detailed written agreement, right?  HAYES Correct. MR. HAYES Which doesn't include any reference to the assignment of intellectual property. MR. HAYES That is correct. All it requires for his employment is essentially that he pass the physical aspects, have a valid driver's license, that he pass the drug test and those types of things. Those are the only future requirements that are set out in that original February contract. Otherwise it sets forth when he should start, which the start date in that document that was agreed upon was March 15th, or at a mutual time agreed to by the parties. So that document sets out March 15th. It sets out his position. It sets out the amount of money that he is going to be paid for his salary, when he is to report to work and what his job duties are. Nowhere in that document is the IP assignment or requirement that he assign any intellectual property to Pinnacle Energy or the parent company Marathon. The only other documents that are dealt with MR. HAYES Let me see if I understand what you are suggesting with that point. Are you suggesting that, okay, he has a document that reflects the general terms of his employment in February, that is executed in February. Then suppose that, let's assume that he does start work on March 30th and he shows up at We have a variety of further more detailed documents that we want you to execute as a condition of your beginning employment, one of which turns out to be the IP agreement. I understand that that wasn't executed until the next week, but he shows up for his first day of work and they present him with this, and he signs it. Are you arguing that there has to be separate consideration for that document, even though he hasn't actually begun work? MR. HAYES There has to be separate consideration because the first document, the February 27th document, constitutes a valid contract under Wyoming law. There was an offer and acceptance and consideration. He began his work. He later signed the April 5th document, and under Wyoming law, Hopper v. Allpet being the main case, says even in at-will employment, while it deals with a non-compete agreement, even in at-will employment, to change the conditions or the restrictions on an employment agreement, there has to be separate consideration for those agreements.  GARGANO Would you say the same thing if they had sent him the IP agreement, let's say, on March 1st and said, you know, we didn't give you all the detailed documents that need to be executed, but here's a further one. If you want to come to work at the end of the month, March 30th, you have to execute these documents as well. Similarly, you would say they have to send along a $5 bill along with that? MR. GARGANO I would say there has to be separate consideration for a contract, which is already in place. GARGANO Let's assume that we would agree with you as it relates to a non-compete agreement. Is there a distinction between how Wyoming would view a non-compete versus an IP transaction? MR. GARGANO That's the beauty, I guess, of you getting to look at Wyoming law here. I suppose you never thought that you would get to do that, but Wyoming law does not have any law with respect to a distinction on intellectual property assignments, and it does deal specifically with the non-compete and other instances.  GARGANO It's fair to say that there's no Wyoming law one way or the other, right? When you look at the Hopper case, you see they say we haven't decided this issue yet, there's a conflict in other courts, and then they go on to say where it's a non-compete agreement, there has to be separate consideration. But I don't read Hopper as having decided the question of whether there has to be consideration under all circumstances. So I think isn't Judge O'Malley correct that they've decided it with respect to non-compete agreements, but that it's really an open question as to other kinds of agreements? MR. GARGANO Well, that is correct that they did decide that as with respect to non-competes. They did decide it with respect to other cases as well. Those cases typically deal with the distinction of you start out as a for-cause employee, and then they want to change you and your contract to an at-will employee. And there's separate consideration required for that. MR. GARGANO Is there an at-will case after Hopper which sheds any light on this? MR. GARGANO No, there is not. And the only thing that we can look to is the Hopper case and the public policy that was set out in the Hopper case. MS. MILLER But the public policy surrounding non-competes is a little different than the public policy that would surround transfer of IP rights.  GARGANO That is correct with the distinction that the non-compete deals with restricting someone's right to work in the future and make a living. In this case, we're dealing with a constitutional property right that an individual holds. And what we can extract from the Hopper case is the Hopper case says that we recognize the unfair characteristics of an employer-employee relationship. In that, an employee doesn't bargain for continued work. That's something that's necessary to their life. And they don't bargain for that continued work. And so Wyoming has said we're not going to recognize continued employment as being sufficient consideration for placing restrictions or requirements on employees. MS. MILLER You encourage us to look to Colorado law. You cite a Colorado appellate court decision where they applied this principle to IP transfers. But the Colorado Supreme Court has since said that they're going to follow Ohio with respect to non-competes. So one would think that your desire to look to Colorado law has shifted. Is that right? GARGANO That is a possibility. Again, we're talking about non-competes and the intellectual property. The way you can draw the distinction there is that, and even in this case, the District Court of Wyoming followed Ohio non-compete law to reach its decision here and then turned around and said, oh, well, Hopper, even though it deals with non-compete, isn't applicable. And what I would suggest is that Wyoming has this sharp distinction. In fact, it's a completely different set of case law than Ohio has on the non-compete issue. Ohio says that continued employment is sufficient consideration. Wyoming says it is not. MS. MILLER Well, if we're confused about what Wyoming would say about this issue, what about certifying the question to the Wyoming Supreme Court? GARGANO We would welcome that, Your Honor. We actually asked the District Court and the District of Wyoming to certify it, and he refused to do so. And we would... MS. MILLER On what ground did he refuse to do so? GARGANO He decided that the Hopper case wasn't applicable because it dealt with non-compete and then went forward to extract Ohio law and put it in place. But I don't know what the exact reasons were for his denial to certify it. MS. MILLER You actually sort of have that backwards. He relied on Ohio law, and then later you pointed out Hopper, and that's when he then distinguished that. GARGANO Correct. MS. MILLER So in the end, he wasn't really relying on Ohio law. He was relying on the fact that this is a totally different kind of contract. GARGANO That's correct, and once he did that, that's when we asked him to certify because prior we felt that Wyoming law was very clear in all respects. While it didn't deal directly with the intellectual property assignment, we felt that it was very clear that it required separate consideration above and beyond continued employment when the court held that Hopper wasn't applicable. Then we asked him to certify it, and he refused to do so. MS. MILLER Thank you. Assuming that we find that the contract is valid, so then we turn to the question of whether or not this reference to the resonating manifold was sufficient to exclude your client's conception or invention from the contract. GARGANO That is correct. MS. MILLER And that's your second point, right? GARGANO That is correct, and there's twofold there. One was the issue of the court didn't even go on to interpret and construe the terms of that employment agreement and the definition of intellectual property, and then specifically with Paragraph 4, which was excluded specifically from that definition of intellectual property. MS. MILLER The relevant definition is really unpatented invention in Paragraph 4, correct? GARGANO Correct. MS. MILLER But don't we have to defer to the district court's findings of fact when the district court said that there was not even a conception? The district court's words were there was little more than a vague idea. That's a finding of fact that was based on credibility determinations. Aren't we very limited in our review of those factual findings by the district court? GARGANO No, because the contract interpretation is done as a matter of law, and what the contract means is then set out as a matter of law. The factual questions come in then as to what is the CH-4 resonating manifold. MS. MILLER Okay. How would you interpret the contract to say that it would cover little more than a vague idea? GARGANO Because the idea was conceived, and actually what the district court said was that it wasn't reduced to practice, and that's what he based his decision on. MS. MILLER Well, no, his words were there was little more than a vague idea. He also said it wasn't reduced to practice, but he didn't even define it as conception, did he? GARGANO I don't know that he even necessarily defined it as conception, but he did say that obviously there was something there that was thought of. There was an idea, and we had submitted to the court that there had to be a conception because Mr. Preston wrote it on the document. And so then the question is he wrote it on the document. He had an idea. He conceived of that idea. What is that idea? MS. MILLER All right. How do you then interpret the phrase unpatented invention in paragraph 4 of the contract? GARGANO The unpatented invention is a broad definition. It doesn't require that there be the elements of patentability. An invention, it is an invention that doesn't necessarily have to be patented or necessarily meet the elements of patentability. It is a conception of an idea that would have a reasonable standard term as set forth for reasonable people, as in I came up with an idea, or the other terms that are there. MS. MILLER Is there any case law in Wyoming or otherwise interpreting that phrase? GARGANO No, there is not. MS. MILLER Okay. We will want to hear from the appellates. Mr. Cohn. MR. COHN May it please the Court, Counsel. I want to address five issues, time permitting. Those will be, first, the enforceability of the employment agreement, as was discussed with respect to the Hopper case. Second, and related to that, I want to discuss the evidence in the case posture as it relates to the March 30th versus March 1st alleged start date. Third, I want to talk about the specific facts, and we do think it's a factual inquiry, not a legal inquiry, as to the application of the employment agreement to what it was that Mr. Preston had allegedly invented. CHIEF JUSTICE ROBERTS Suppose he had conceived of this invention during his Marathon employment. He then left that employment and then reduced the conception to practice. Who, under those circumstances, would own the invention? MR. COHN Marathon would own the invention, but it would struggle with a very difficult issue of proof, the same issue of proof that Mr. Preston failed to meet in proving that he conceived of this thing before he joined Marathon when, in fact, he had no witnesses to prove that. CHIEF JUSTICE ROBERTS Okay, but that's a different issue. So it seems as though the ownership question turns on when the conception of the invention took place, since, in your view, if he conceived of it when he was working for Marathon, that Marathon owned it even if all the reduction to practice, et cetera, took place later. And so wouldn't that same thing, wouldn't the logical construction of the agreement be that if he conceived of the invention before he started work, he would own it, even though the reduction to practice took place during his employment? MR. COHN If, in fact, he could prove that the invention he conceived was the CH4 resonating manifold and if he could prove the meets and bounds of that invention on the day that he came to Marathon in a concrete form, he couldn't prove that factually. CHIEF JUSTICE ROBERTS But if he could, you're saying that the fact that he reduces it to practice while he's working for Marathon nonetheless owns the invention. MR. COHN Yes, for example, had he come to Marathon with drawings ahead of time, and this is the invention, even if he didn't note it specifically on the thing, if he could prove predated drawings of a detailed invention that is the same as what it is he worked on at Marathon, that would be good evidence that he conceived of it before, or if he had witnesses. CHIEF JUSTICE ROBERTS The fact that he conceived is sufficient, in your view, to give him independent rights to the invention, even though it's reduced to practice during his tenure as an employee at Marathon. MR. COHN There's two issues. One is if it was made during his employment, then it would be covered under the grant clause to Marathon. The second, though, is that's the clause that giveths, and the clause that taketh away from Marathon is what's specified below as a prior invention. If, in fact, he conceived that and could prove that he conceived that, sure. He couldn't do that in this case. CHIEF JUSTICE ROBERTS And to the extent we have to interpret the contract, we have to interpret it, though, construe it against the employer, correct? MR. COHN That's correct, but I don't think there's any interpretation needed. I think this is a very simple case, not of contract interpretation, but of fact-finding, and that is was this something that was developed during his employment at Marathon, or was this, in fact, the thing that he developed at Marathon? Was that the same as the CH-4 resonating manifold? MS. MOSS I have a problem with your brief on that point, speaking of fact-finding. You say at page 48 that the substantial evidence supports the district court's finding that the patent inventions are different from the CH-4 resonating manifold and were developed during the course of Preston's employment with Marathon. Now, there's no citation to the record, and you'll have scoured the record and cannot find that finding anywhere, but the district court didn't find that, did they? MR. COHN The district court found that it was a vague idea, and I think that's where we're relying entirely. MS. MOSS What you say here, what you say is the district court made a specific finding that the CH-4 resonating manifold was different from the patented invention, and that's not what the district court found. MR. COHN Well, then that's my mistake in my writing the brief, and I take responsibility for that. What I think the district court found is what the question for this court is, is CH-4 resonating manifold, as it existed on the date that Mr. Preston signed that agreement, is that the same as the patented inventions? So what do we know? MR. MILLER Not to really resolve that question clearly, the district court, in terms of the findings. He does not specifically find either that it was conceived before he joined Marathon or that it wasn't. MR. COHN I would disagree with that. I would say that the court found that it was nothing more than a vague idea when he came there, and substantial evidence supports that, namely the lack of any witnesses who ever saw or ever talked to Mr. Preston, the lack of any drawings. The only thing we know about the CH-4 resonating manifold is what Mr. Preston drew up in a diagram during his deposition. He claimed this was a very valuable invention, and he claimed to have prior drawings, but he couldn't find anyone who had actually seen them. He allegedly lost the drawings and could not produce them at trial. He never showed them to anybody. When he came to Marathon and started work on this project, some year, year and a half later, he prepared initial sketches, and although the final invention that's used in Marathon's wells looks similar in some respects to the alleged CH-4 resonating manifold, those initial sketches look nothing like it. They look like a single plate with holes in it. So this is a guy who claimed to have invented something very specific that looks like the end product, yet when he begins work on the project, he starts with something very crude, and it moves into that form. Let me see if I . . . we've been talking about findings of fact and conclusions of law by the district judge, and I want to make sure that I'm looking at the right portion of the judge's various findings. If you look at A-20 in the blue brief, this is, I take it, the issue that we're focusing on, right? Number 8, that's actually a conclusion of law, but relates back to a findings of fact by the district judge, and the district judge is saying, after saying his testimony is not credible, that he had a little more than a vague idea pre-employment, and then concludes as a matter of law that he did not invent the manifold. That's, I take it, your argument is that when he says vague idea, he's . . . what the district court needs is no conception at that point, right? Is that . . . am I reading your . . . effectively your translation of the district court's finding and conclusion on that correctly? Yes, Your Honor. To the extent he conceived something, he didn't conceive the final product that gets put into Marathon's wells, and more specifically, he didn't conceive the claimed invention of the 385 and the 764 patent. And although these are . . . Your problem is that on A-11, he said it is possible Mr. Preston had an idea for an invention before his appointment with Marathon, and then says, in any event, he finds it wasn't reduced to practice. So he seems to be relying on the wrong standard here, saying that it had to be reduced to practice before his appointment with Marathon, which you've agreed is not correct. So the problem is, is it really that clear what he's saying? He says there's some idea beforehand, but, you know, was it . . . the invention or didn't he conceive of the invention? I'm not sure that it's clear from the findings and conclusions what the district court is saying about that. I guess I'd make three points if I can. One would be the conclusions of law, I believe, are clearly stating fact findings, notwithstanding being labeled conclusions of law. The notion that, one, Mr. Preston's testimony is not credible on this point, and two . . . and that comes after days of . . . hearing days of Mr. Preston's testimony. And, two, that the level of development was that it was a vague idea at best. I think that's a fact that the court has found, not a conclusion of law. Then I apply that back in context of the invention. The question isn't so much, did conception occur or did it not occur? The question is, what did Mr. Preston prove was conceived? And there's . . . what he proved was nothing more than a vague idea. There was no . . . and so, finally, I would say there's no evidence to support a finding to the contrary. Can I move you on just briefly to the consideration question? Yes. And, you know, I suggested earlier that Hopper leaves this up in the air as to whether additional consideration is required outside of the covenant not to compete context. Is there anything that you know of since Hopper in the Wyoming Supreme Court that would tell us what the answer to that broader question is? No, I know of no other cases from the Wyoming Supreme Court. What I know is that the general law in Wyoming is at-will employment. I know that the Penteco agreement that Mr. Preston agreed to early on, before he started work, made very clear he was at-will . . . including the fact that he might not have wanted to sign the assignment agreement on April the 5th. That's the general rule in Wyoming. Hopper is an exception for a narrow situation concerning a covenant not to compete. And, on that point, we would refer to the judge's order where he specifically addresses Hopper . . . not the findings and conclusions, but the earlier one at the very outset of trial . . . where he clarifies what he had intended on summary judgment. Because, I think that states it well, the rationale why Wyoming would not extend the Hopper case to another area. But, if that were the . . . and finally, I guess I would say there's no reason to send it to the Wyoming Supreme Court. For those same reasons, also the fact that Mr. Preston didn't appeal the denial of his motion to certify. Not that that would prevent this court from doing it, but . . . It doesn't get to him. But, it's . . . and while this court certainly could . . . You could ask for . . . anytime you want to extend a particular line of cases . . . that would . . . then you would send it to the Wyoming Supreme Court. What's clear is the Wyoming Supreme Court has made one very narrow exception . . . based on a long line of public policy and history . . . disfavoring covenants not to compete. Well, that's true. But, you agree Wyoming law applies. I'm sorry. Absolutely. And, that was an issue I wanted to address. I think the judge's footnote in his order makes clear that, you know, we've not contested . . . There was some disagreement early on on summary judgment whether Ohio law would apply or not. As the court knows, we've not contended it. We were looking at Wyoming law. Wyoming law has a general rule that has one narrow exception. Well, that's not quite true because Hopper says we haven't determined this issue . . . and then goes on to determine it in the narrow context of covenant not to compete. So, they'd say we haven't determined the issue. It seems to me that that's sort of binding on us, that they haven't determined the issue. Well, I think what they haven't determined is whether additional consideration is needed to impose a covenant not to compete. This is a different situation. Mr. Preston could have been dismissed from his employment. No, they have decided that question. Oh, they absolutely have now. Yeah, that's the narrow question they decided in Hopper. They didn't decide the broader question as to whether additional consideration is necessary in other contexts. No, that's true. Very true. Could I have one question about ShopRite? I read the district court having said there's a ShopRite in the 11 installations, but it seems not to have reached the question of whether there's a ShopRite going beyond the 11 installations for the future, if Marathon should decide it wanted to re-install this in additional wells. Do I read it correctly? I think that's fair. It's been removed from all 11 wells. It was removed from all but two wells before the 764 patent ever existed. I'm not sure I understood your answer, though. Are you saying you think it's fair to say that the district court limited the ShopRite to the 11 wells, or do you think it's fair to say that the district court left open the question of use in the future? I think it's an open question for use in the future and a hypothetical question because there was infringement allegations in the original complaint. That's what got tossed with the ShopRite summary judgment motion. There's no reason for this court or the district court to consider what Marathon might hypothetically do in the future with this. It hasn't been installed since then. There's not an issue. We don't think there's a live issue on that point. Clearly, there's a ShopRite that would extend to the 11 wells where this was installed. I'm sorry. They do dispute that point, though. Your opponent says it should be limited to the three wells that he participated in or arguably to those wells that were installed while he was still employed. There were some that were installed after he was employed, after he left employment. Isn't that right? That's correct, yes. We think the law of ShopRite would allow Marathon to use this invention, frankly, as it deems fit, if that issue were right, throughout the United States wherever it wanted to, certainly throughout the Powder River Basin in northeastern Wyoming, and that's the only place this has ever been installed. Further, we point to the evidence and say that what we're really talking about is something like 40 baffle plates that were manufactured for Marathon at Mr. Preston's request. They were paid for by Marathon. They were shipped. The invoice was sent to Marathon to the attention of Mr. Preston. He knew full well that approximately 40 baffle plates were manufactured. These wells had between one and four baffle plates depending on the configuration. No more baffle plates were ever manufactured. And this was the initial lot of plates that he purchased. There was also a wish list introduced at trial that talked about the wells that might possibly have this installed. Again, this wasn't as though it was expanded significantly. This is clearly within the scope of any ShopRite. Let me ask you about the relationship between the two agreements that we have in the record, the February 22nd agreement and the April 5 agreement. The issue arose and the district court made some findings with respect to this. Ultimately, it didn't rely on the relationship between the two agreements as a basis for avoiding the problem of lack of consideration. Do you argue that the second agreement is, regardless of the law of Wyoming, with regard to whether separate consideration is required ordinarily for a separate agreement in the context of the employment relationship, even in employment at will? Are you arguing that this April 5 agreement is part and parcel of the set of agreements associated with the initiation of employment and therefore does not require separate consideration? Yes, and if I can respond to that in a little more general fashion. The issue of whether separate consideration would be required for the April 5 agreement should never have been at trial. The court had ruled prior to trial, and that's why you don't see even further evidence of when Mr. Preston started. The issue, the court had already decided on summary judgment that no separate consideration was required. The issue was renewed on the eve of trial, and the court ruled the first day of trial from the bench, which is followed up by the order that was filed on January 26th, actually signed the 25th, where he explains this rationale. But the point is, before the trial even started, it never even should have, the issue of Mr. Preston's start date should not have been introduced, quite frankly. It shouldn't have been relevant to anything because we weren't trying that issue. That notwithstanding, yeah, we've got the only documentary evidence is the W-4 and this document, and then there's a benefit statement that if you actually look at the top of it, it says his effective date is also March 30th. But I'm confused. Are you agreeing that we are dealing with two separate agreements, or are you arguing that the two agreements are part of a single agreement? I'm sorry, I misunderstood the question then. No, I'm arguing that they are two separate agreements. The first one, the Penteco agreement is what began his employment at Marathon, or ultimately became Marathon. We never had one document introduced showing that he worked for Penteco or a prior company. Here's the question that I'm trying to get at. Suppose on February 27th, whatever the date is, yes, February 27th, this letter had gone out to him, and at the bottom of it it said, the last sentence had been added, which said, along with this letter, we're sending you some papers that we need for you to fill out if you are intending to work for us. One of which, let's assume, was the Marathon Oil Company and Subsidiaries Employee Agreement, and he filled that out. It's a separate agreement. It identifies itself as a separate agreement. We can all agree to that. But I assume that no one, well, maybe someone would argue, but I would assume that you would argue that that agreement required no separate consideration because it was all part and parcel of his initiation of employment set of agreements, whether you call it one agreement or multiple, correct? Correct. But quite a part, even if Hopper had been explicitly decided by saying that new agreements between an employee and employer, even in an at-will setting and even with respect to IP property, have to be supported by consideration, even if that's what Hopper had said, you would still say, well, but that isn't this case because this was a set of agreements entered into at the initiation of employment, right? Yes. And so the question is, what's the relationship between that argument and these facts? Can you make the argument, and do you think the district court has made the findings sufficient to justify the argument that this agreement entered into on April 5th is part of the initiation of employment set of agreements? What I would say in response to that is there's no required, that we get to the exact same result, whether he signs the agreement on the day he starts, the minute he starts, or a year later, because he could have been dismissed as an at-will employee at any time for any reason. But if we assume that Hopper resolved this question against you, or if we should certify this to the Wyoming Supreme Court, the Wyoming Supreme Court should say, absolutely, Hopper covers IP agreements. Okay? Let's assume that, so that if this were an agreement entered into a year later, you would lose.  Can we start with that assumption? Yes. Do you have a separate argument, is my question, that this agreement on 4501 is part of the initiation of employment set of agreements such that that Hopper extension would not apply? I think I would have to punt and say that it would depend what the Wyoming Supreme Court in that instance specifically said, because in my view, one should be left to the legislature to carve out exceptions to this established weapon law. Do you have a separate argument with respect to the relationship between the two agreements? None other than if that were the case, I would rely on what's in our briefs regarding the absurd results, that if we're talking about a very short period of time, it would be absurd to, and that's more an issue that I think the Wyoming court would address. Well, that's a rebuttal from Mr. Edwards. Thank you. I see my time is very short. I just want to address one point, that being the last point of the distinction between the two agreements. The first agreement, the February agreement, is the contract for the employment, and there is no condition in that agreement for him to assign or to sign any other documents dealing with assignments of intellectual property. The other agreement that was signed on April 5th, while it's entitled the employee agreement, is really an intellectual property assignment. It's a separate document, and there was no additional consideration outside of the work aspects of this for that document. So it would be no different than me working for a company, and them coming to me later and saying, hey, you have a patent, sign this patent to me. There needs to be separate consideration for that assignment. And that's what did not occur here, was there was no separate consideration for that separate agreement, and it was not tied as a condition to his employment when he signed his original employment contract. It just strikes me that in the real world, there are many, many instances, in fact, I've had that experience myself, in which you enter into an agreement for employment, which is pretty general in terms, salary, general set of tasks to be performed, start date, and you enter into that agreement six weeks before you enter on service. On the day you arrive to enter on service, an employee gives you a sheet of papers and says, here are a variety of other things that are required of you, such as, here is our policy on the use of office supplies, here is our policy as to this, that, and the other, and if you breach any of these policies, you're in breach of your employment contract. It seems, I don't think anybody would occur to anybody that you have to be given some additional consideration at that point, do you? In Wyoming, I do believe that in an instance where you're requiring someone to sign a property right to you, that it is, and we often always advise our clients in these circumstances to give them separate considerations. And in the policy context, it's different. In filling out W-2s and things like that, you're not requiring the employee to give you their rights, their property rights. Thank you. The case is submitted. We thank both counsel.